Jose CISNEROS et al.

v.

**CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT et al.**

Civ. A. No. 68–C–95.

United States District Court,
S. D. Texas,
Corpus Christi Division.

Aug. 23, 1972.

Chris Dixie, Houston, Tex., and James DeAnda, Corpus Christi, Tex., for plaintiffs.

Richard Hall, Corpus Christi, Tex., for defendants.

ORDER

OWEN D. COX, District Judge.

There was filed on August 16, 1972, "Plaintiffs' Post Appeal Motion No. 1," which is predicated upon a provision in the August 2, 1972, opinion of the Court of Appeals, 467 F.2d 142, at page 153 thereof, which reads:

"An overall amelioration of any possible discrimination will tend to be accomplished by the use of the mandatory majority-to-minority transfer provision of *Swann* [Swann v. Charlotte-Mecklenburg Board of Education], supra, 402 U.S. [1] at 36–37, 91 S.Ct. 1267, 28 L.Ed.2d 554, heretofore ordered by the district court. Such provision will guarantee to both races an unfettered right to attend schools with members of an opposite race or identifiable ethnic group, and with transportation provided."

The Plaintiffs request, by such motion, "an immediate order" directing an "appropriate majority-to-minority transfer provision for Negro students and for Mexican-American students and further directing Defendants to provide appropriate transportation for eligible students who elect to avail themselves of such provision," or, in the alternative, they move for a hearing on the motion.

A hearing was held on August 21, 1972, commencing at 9:30 a. m. At the outset, Plaintiffs orally requested and were allowed to amend said motion so that any relief granted would apply to Anglo students, as well as to the Negro students and Mexican-American students originally mentioned in the motion.

There was no oral testimony nor documentary evidence presented to the Court during the hearing. Counsel for the parties did stipulate that there had already been filed with the Corpus Christi Independent School District 418 applications for majority-to-minority transfers within the school system, and of these applicants, 25 are black students, 8 to 10 are Anglo students, and the balance, being approximately 383 applicants, are Mexican-American students. It was further stipulated that about 95% of those student applicants would have to travel two miles or more from their respective homes to the schools of their choice. This two-mile distance is apparently con-

sidered important because of the provisions of Section 16.57(f) of the Texas Education Code, 1971, V.T.C.A.

The Plaintiffs, in support of their motion, argued that, as a matter of law, they are now entitled to an order requiring the Defendant School District to "provide appropriate transportation for eligible students who elect to avail themselves" of such majority-to-minority transfers. They further contended that, since a majority-to-minority transfer provision had already been established by the Defendant School District, all they are really asking for is transportation for these students. No complaint was made about the majority-to-minority transfer plan, except for its failure to provide transportation.

The Court recognizes the relevancy of the portion of the Court of Appeals' opinion quoted in the first paragraph of this order. The Court cannot disregard the further language of the Court of Appeals that "The district court is directed to constitute a tri-ethnic committee in the school district to foster the use of the majority-to-minority transfer." However, the Court of Appeals' language must necessarily be read with that of *Swann* on pages 26 and 27, 91 S.Ct. on page 1281, reading, in part,

"An optional majority-to-minority transfer provision has long been recognized as a useful part of every desegregation plan. Provision for optional transfer of those in the majority racial group of a particular school to other schools where they will be in the minority is an indispensable remedy for those students willing to transfer to other schools in order to lessen the impact on them of the state-imposed stigma of segregation. *In order to be effective, such transfer arrangements must grant the transferring student free transportation and space must be made available in the school to which he desires to move.*" (Emphasis added.)

This Court recognizes the language just quoted relates to a majority-to-mi-

nority transfer provision which is a part of a complete desegregation plan, and that here in Corpus Christi, Texas, there is no overall plan in effect at this time. The present majority-to-minority transfer rule is apparently an interim means of satisfying some of the needs of the Plaintiffs until a complete plan has been promulgated.

This cause was remanded and the District is instructed by the Court of Appeals "to desegregate the school system" and the first step is embodied in language which says,

"(1) It is the prerogative and duty of those local officials having charge of the Corpus Christi Independent School District to formulate and implement student-assignment plans."

and, in paragraph (2) calls upon the Defendant School District to "forthwith formulate and implement such student-assignment plan as will remedy the discrimination which has been found to exist." That discrimination exists is no longer in issue. We are now at the point where the remedy is the thing.

The final numbered paragraph, being number 7, reads, in part, "such racial balance as may result from the pairing or clustering or rezoning of schools is constitutionally permitted as 'an interim corrective measure',," and such language is followed by the directive regarding the "mandatory majority-to-minority transfer provision" which the Fifth Circuit attributes to *Swann*.

The Court realizes that there will very likely be some transportation required in any plan which the School District presents in order to satisfy the requirements of the Fifth Circuit. And, additionally, this District Court is convinced that, at this point, to totally deny Plaintiffs' request for transportation of the majority-to-minority transfer students would seriously offend the sensitivity of the appellate judges, thus such action by this Court would be but an exercise in futility. Even though said 418 applications for majority-to-minority transfer must have been made without expecta-

tion of transportation, it must now be made available.

It is therefore ordered, adjudged and decreed that "Plaintiffs' Post Appeal Motion No. 1" be, and it is, granted, subject to the conditions hereafter set forth, and the Corpus Christi Independent School District must provide transportation for the majority-to-minority transferees in accordance therewith. The conditions limiting this order are:

(1) This order certainly relates to an interim measure, and in order to forestall any attempt to accomplish extensive school transportation between schools by a heavy, last minute inflow of transfer applications, no transportation need be provided for those students who have filed their applications subsequent to the close of business on the 21st day of August, 1972;

(2) No transportation need be provided for those whose applications were filed in order that they may attend the school which they would have attended before any recent boundary changes applicable to the 1972–73 school year occurred;

(3) All eligible transferees under this order will be immediately notified by the School District of the availability of transportation and any transferees who desire that transportation be furnished shall notify the School District by September 1st and actual transportation shall commence on the 4th day of September, 1972; and

(4) This Court is aware that question may be raised regarding this order. The Court has continuing authority regarding this matter. Any requests for clarification or modification must be made in writing and filed with the Clerk of this Court.

This Court further orders that the Corpus Christi Independent School District speed up its operations toward the formulation of a student-assignment plan for the District. The collective activity of those in charge cannot now continue at what the Court considers to have

been a dilatory pace. A skeleton plan, prepared in good faith, should be presented to the Court on or before the 15th day of September, 1972.